equity is not constrained to forbear until an entire community ·is deprived of water, and all house connections with the water plant have been swept away. The court does not wait until a forest has been wrongfully felled if a survey foretelling the act is in progress. Unjust exaction justifies judicial interference; threatened interference with the connection and the supply, unless there be submission to such exaction, is equivalent to it. For the purpose outlined, the action is maintainable.

[3]. But may the plaintiff unite as parties plaintiff other customers? Is there a common right infringed by a wrongful act affecting all?

"Where the question is one of a common or general interest of many persons, or where the persons, who might. be made parties, are very numerous, and it may be impracticable to bring them all before the court, one or more may sue or defend for the benefit of all." Code of Civil Procedure, § 448.

The right to the use of the streets flows from the municipality, and the defendant owes to the inhabitants, because they are such, the duty of furnishing water at a reasonable price. It is true that each right is several in its exercise, but it springs from a duty to the community, and the defendant threatens each one with a breach of duty, not only to him, but to the community and to the state. It would seem to be a fair occasion to invoke the statute.

The interlocutory judgment is affirmed, with costs, with leave to defendant to answer upon payment of costs within 20 days after notice of entry of judgment herein.

JENKS, P. J., and CARR and RICH, JJ., concur. BURR, J., concurs upon the ground that the allegation in the complaint that the rates sought to be charged are excessive and unreasonable must be deemed admitted by the demurrer.

---

### KNAPP v. NEW YORK, N. H. & H. R. CO.

(Supreme Court, Appellate Division, Second Department. July 25, 1913.)

RAILROADS (§ 333*)—CROSSING ACCIDENT—CONTRIBUTORY NEGLIGENCE.
One who, driving on a trot to a railroad track without looking, just before reaching it saw a person warning him, and the train struck his horses about the same instant, and, continuing, was killed, was guilty of contributory negligence.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1080–1083; Dec. Dig. § 333.*]

Appeal from Trial Term, Dutchess County.

Action by Coleman J. Knapp, administrator of George H. Knapp, deceased, against the New York, New Haven & Hartford Railroad Company. From a judgment for plaintiff and from an order denying a motion for new trial, defendant appeals. Reversed and dismissed.

See, also, 138 App. Div. 890, 122 N. Y. Supp. 1133.

Argued before JENKS, P. J., and BURR, THOMAS, RICH, and STAPLETON, JJ.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Walter C. Anthony, of Newburgh, for appellant.
Morschauser & Mack, of Poughkeepsie, for respondent.

THOMAS, J. The decedent, Knapp, past his seventieth year, active and sound in hearing and sight, while going eastward across defendant's track, was killed by a freight train south bound, between 8 and 9 o'clock in the morning in December. Several persons testified that warning signal was given, and several that it was not. While it seems probable that some signal was given, as the train was not otherwise permitted to enter the block, yet was there a whistle for that purpose and the usual crossing signal omitted? The engineer states that he blew the whistle at four several places, whereof the first was a long blast for the block "at least one-half to three-quarters of a mile back." But a signal at that point does not satisfy the evidence given by the engineer that three further separate signals were given, nor the corroborating testimony of the conductor and two brakemen and the station agent. Moreover, a person working in the creamery, which is some 525 feet north of the crossing, heard a signal as the train was passing, and in this he is directly confirmed by another person on a highway, also by a man in a car near the crossing, while a witness in a distinctly different locality heard a signal, and to this should be added the testimony of a woman living near the crossing, who testified that a signal was given "at about the creamery," and repeated. Her description indicates alarm signals, and in this she is supported by other witnesses, although the engineer does not assert that he gave any and a brakeman disclaims them. Several men in a position to hear and attentive did not hear. Some had a motive in listening and hearing, one because his horses would be frightened by the signal, another because he was expecting something on the train and so attentive to its coming, and, while others not hearing the signals were not especially listening, still another was watching the train. But one witness, Davis, testified from more intimate relation to the accident. He saw the coming train but heard no signal, and, apprehending a collision, hurried to warn the traveler and did so attract his attention that he discovered the train bearing down upon him, but kept his way until he was struck.

The question comes to this: Did the decedent by his negligence contribute to his death? Although several persons noted him, no one saw him look save straight ahead except when warned by Davis. On the north side of the road was a feed store with a frontage of 60 feet, and along its east side was a switch on which were three cars, one of which projected seven feet into the road, and then there was a clear space of 26 feet (less 3½ feet, the overhang of the car) before the track was reached, whence the train could be seen for a long distance. Although west of the feed store a train could be seen, except as inconsiderably interrupted by the creamery, the store and adjacent cars intercepted the view, yet after they were passed there was an open space of 22½ feet, and a person then looking could not fail to see the train, and, if he saw it coming, he could stop or divert his course to his left hand, where there was a road leading to the creamery. It was the duty of the traveler to look before entering

the tracks after passing the buildings, and to proceed with caution. Davis was quite aware that the decedent, not looking and unconscious of the train, was driving at the rate of five or six miles an hour, and it appears that just as the horses reached the track he struck them. The witness best described the scene:

"After I got his attention he saw me and the train about the same time. The horses' heads were then as close to the track as I am to you; about 10 or 12 feet away when I caught his eye. He struck them with a whip, but not just at that instant. When he struck them with the whip, their heads were almost on the track, not quite. * * * And as he struck them with the whip, they went ahead faster. The train struck right where the whiffletree is."

Later the witness says:

"He looked at me and turned his head towards the train coming. He had a whip in his hand when he first saw me, and he immediately struck his horses with the whip."

A former judgment for plaintiff was reversed because it was not proven that the decedent looked or listened. 138 App. Div. 890, 122 N. Y. Supp. 1133. Here, it appears that he did not look until warned, when the train was all but upon him, and that he was driving his horses on a trot to the track, striking them with a whip at the instant of warning. There was a road at his left to receive him, so that he was confronted by no predicament. Nor does the testimony of the witness Baker aid plaintiff. He says:

"He was looking right straight ahead when I first saw him. Just before the accident he looked up the track; he turned his head slightly to the north. That was the direction in which Mr. Davis was. Then he saw Mr. Davis and the train about I imagine— And then the car struck him."

The event is plain. He drove on a trot to the track without looking, saw Davis and the train, striking his horses about the same instant, and, continuing, was killed. He clearly aided his misfortune.

The judgment and order should be reversed, and the complaint dismissed, with costs. All concur.